USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__11/9/17____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AYODAPO OLADAPO, *on behalf of himself and all others similarly situated*,

Plaintiff,

-against-

SMART ONE ENERGY, LLC,

Defendant.

14-CV-7117 (LTS) (BCM)

**REPORT AND RECOMMENDATION TO THE HONORABLE LAURA TAYLOR SWAIN**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Ayodapo Oladapo, suing on behalf of himself and all others similarly situated, alleges that defendant Smart One Energy, LLC (Smart One) engaged in fraudulent and deceptive sales tactics in order to induce customers to purchase natural gas from Smart One rather than from regulated local utilities or other energy suppliers, and thereafter overcharged those customers in violation of the promises it made concerning its rates. Following informal discovery and mediation before a retired federal district judge, the parties executed a Settlement Agreement dated as of May 4, 2017.

Now before the Court is plaintiff's Uncontested Motion for Preliminary Approval of Class Action Settlement, filed May 5, 2017 (Dkt. No. 80), which seeks an order: (1) preliminarily approving the settlement (Settlement) as fair and reasonable; (2) conditionally certifying the proposed settlement class (Settlement Class or Class); (3) appointing Oladapo as Representative Plaintiff and his lawyers, Charles J. LaDuca and Richard D. Greenfield, as Class Counsel; (4) directing that notice be given to the members of the Class (Class Members) pursuant to the terms of the Settlement Agreement; (5) finding that such notice constitutes the best notice practicable under the circumstances; (6) scheduling dates and deadlines for a Final Approval Hearing, for Class Members to opt out of or object to the settlement, and for Class

Counsel to file a motion for fees and expenses; and (7) setting a date for a final settlement approval hearing (Final Approval Hearing).

For the reasons that follow, I respectfully recommend that the motion be DENIED, without prejudice to renewal if plaintiff can present facts from which the Court can determine that the proposed Class is certifiable and that there is probable cause to believe that the terms of the Settlement, including the monetary consideration, the equitable relief, the release, and the proposed fee award to plaintiffs' counsel, are fair, reasonable, and adequate.

## I.   BACKGROUND

### A.    Procedural Background

Plaintiff filed this action on September 4, 2014, and amended his complaint as of right on January 16, 2015. On March 26, 2015, after defendant moved to dismiss plaintiff's Amended Complaint, the Honorable Laura Taylor Swain, United States District Judge, issued an Order (Dkt. No. 31) permitting plaintiff to file a Second Amended Complaint (SAC), which he did on April 10, 2015. (Dkt. No. 35.) On January 27, 2016, the District Judge ruled that plaintiff's allegations were sufficient to withstand defendant's renewed motion to dismiss, which she denied. Mem. Op. and Order (Dkt. No. 54) at 10.

"Shortly thereafter," according to attorney LaDuca, "informal discovery began, including, among other things, seeking Smart One's marketing materials and obtaining information regarding the marketing practices of other companies in the same industry as Smart One." Declaration of Charles J. LaDuca (Dkt. No. 81-9) ¶ 2. LaDuca adds that "Smart One responded to informally-served discovery propounded by Plaintiff herein." *Id*. LaDuca does not further describe plaintiff's discovery efforts, or its fruits.

On July 21, 2016, the parties attended a one-day, in-person mediation conducted in New York by the Honorable Stephen M. Orlofsky, who retired as a United States District Judge for

the District of New Jersey in 2003. LaDuca Decl. ¶ 2. The mediation continued via telephone

and email until November 2016. "With Judge Orlofsky's active assistance and guidance . . . the

parties were able to negotiate a settlement in principle." *Id*. The settlement terms are now set

forth in the Settlement Agreement (Ag.) (Dkt. No. 81-1), executed by both parties, which

includes, as exhibits: a Claim Form (Ag. Ex. A) (Dkt. 81-2); a Summary Notice (Ag. Ex. B)

(Dkt. No. 81-3); an Expanded Notice (Ag. Ex. C) (Dkt. No. 81-4); a Request for Arbitration (Ag.

Ex. D) (Dkt. No. 81-5); a form of Preliminary Approval Order (Ag. Ex. E) (Dkt. No. 81-6); and a

form of Welcome Letter (Ag. Ex. F) (Dkt. No. 81-7).

Other than the Settlement Agreement and its exhibits, which are attached to plaintiff's

Memorandum of Law (Dkt. No. 81), plaintiff's motion is supported only by the LaDuca

Declaration, which contains a total of four paragraphs.[1] There is no declaration from (or

information concerning) attorney Greenfield, who seeks appointment as co-Class Counsel.[2] Nor

is there any declaration from (or information concerning) the proposed Claims Administrator

---

[1] The first paragraph states that LaDuca is a partner in Cuneo Gilbert & LaDuca, LLP (CGL) and is co-counsel for plaintiff. The second paragraph states that CGL, along with Greenfield & Gilbert, have represented plaintiff throughout this action; recites the (brief) procedural history of the case; and asserts, as noted above, that plaintiff engaged in unspecified "informal discovery" before agreeing to settle the case. The third paragraph states that CGL's work "was both substantial and critical to the successful resolution of this litigation." LaDuca states that his firm, along with co-counsel, researched "the complicated allegations undergirding this action" and developed "a compelling theory of the case" and that CGL "took the lead" in drafting the complaints, "played a role" in drafting a mediation statement, "participated" in the mediation, and "took the lead" in drafting the settlement agreement. The fourth paragraph states that LaDuca and his firm have "extensive expertise in, and knowledge of, consumer class actions," and lists other cases in which he or his firm have served as lead or class counsel.

[2] Public records indicate that on April 20, 1995, attorney Greenfield was suspended from the practice of law in New York for one year*, nunc pro tunc*, after being suspended by the United States District Court for the District of New Jersey in 1993 for "knowingly failing to disclose certain key facts relating to the court's determination of issues concerning conflicts of interest and the appointment of counsel in two class actions." *Matter of Greenfield*, 211 A.D.2d 29, 30, 625 N.Y.S.2d 204 (1st Dep't 1995), *reinstatement granted*, 216 A.D.2d 167, 628 N.Y.S.2d 480 (1st Dep't 1995).

(identified as Rust Consulting, *see* Ag. ¶ II.J.2), the plaintiff himself, or any other member of the proposed Settlement Class.

On May 12, 2017, the District Judge referred the preliminary approval motion to me for report and recommendation. (Dkt. No. 84.)

### B. Plaintiff's Allegations

The Second Amended Complaint alleges that Smart One engaged in a "fraudulent and deceptive 'bait and switch' sales campaign," SAC ¶ 1, pursuant to which it promised potential customers that, if they switched to Smart One from their local regulated utility or other energy suppliers, they would receive a low introductory rate, after which they would be charged "purportedly competitive market rates and savings on their energy bills." *Id*. In reality, plaintiff alleges, consumers induced to sign up for Smart One's services saw their bills "increase dramatically." *Id*. ¶ 9. Plaintiff further alleges that Smart One's rates "bear no relation to changing market conditions, about which typical consumers have no personal knowledge." *Id*. According to plaintiff, Smart One knew all along – because of its business model and history of pricing – that "its rates would always be higher than market rates." *Id*. ¶ 14.

Plaintiff Oladapo, who resides in Maryland, SAC ¶ 5, was allegedly misled by an advertisement placed in Clipper Magazine which promised that customers who switched to Smart One would "save up to 10% on their energy expenses." *Id*. ¶ 18. Plaintiff saw the ad in or around May 2013, and became a Smart One customer the following month, in reliance on its claims – also made on defendant's website and by a Smart One representative over the telephone – that he would "save up to 10%" by switching from his previous natural gas supplier, Washington Gas, to Smart One. SAC ¶¶ 18-19. A Welcome Letter that plaintiff received in or around June 2013 promised that he would enjoy "up to 10% savings on the Washington Gas

variable gas supply charge for two months," and that Smart One's rates would "generally remain competitive" thereafter. SAC ¶ 20.

In fact, Smart One immediately began charging plaintiff higher gas prices than those charged by his former supplier. In July 2013, Smart One charged plaintiff $0.6500 per Therm, compared to $0.6029 per Therm charged by Washington Gas. By February 2014, Smart One was charging plaintiff $0.9800 per Therm, compared to $0.6631 per Therm charged that month by Washington Gas. *Id.*[3] Smart One's prices, according to plaintiff, bore no relationship to "currently prevailing 'gas market conditions,'" and plaintiff "never once saved money on his energy bill from Smart One." *Id.* ¶ 21.

Plaintiff asserted claims for breach of contract, fraud, negligent misrepresentation, unjust enrichment, and violation of Maryland's Consumer Protection Act, Md. Code § 13-101 *et seq.*, on behalf of himself and "all others who purchased energy from or through Smart One from January 1, 2010 to the present." SAC ¶ 31. He sought to certify a nationwide class with respect to his common law claims and a Maryland subclass with respect to his statutory claim. Although the "exact number of members of the Class and the Sub-Class" was unknown at the time he filed the Second Amended Complaint, plaintiff "believe[d] that the Class encompasses thousands of individuals who are geographically dispersed throughout the nation," including "more than 100"

_____

[3] A "Therm" is "[a] unit of heating value equivalent to 100,000 British thermal units (Btu)." American Gas Assoc., *Natural Gas Glossary*, https://www.aga.org/knowledgecenter/natural-gas-101/natural-gas-glossary (last visited Nov. 9, 2017.) Plaintiff does not allege how many Therms he used while he was a Smart One customer, making it impossible to quantify the dollar difference between his Smart One gas bill and the bill he would have received had he stayed with Washington Gas. According to the American Gas Association, the average annual residential consumption of natural gas in Maryland was 745 Therms (or 74.5 "Dekatherms," expressed as "MMBtu") in 2013, and 788 Therms in 2014. *See* American Gas Assoc., *Average Annual Gas Consumption per Customer per State*, https://www.aga.org/knowledgecenter/facts-and-data/statistics/annual-statistics/energy-consumption (last visited Nov. 9, 2017).

in Maryland. *Id.* ¶ 33. Plaintiff further alleged that "the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs." *Id.* ¶ 3.

## II.    THE PROPOSED SETTLEMENT

### A.    The Class

The proposed Settlement Class consists of all persons in the United States who were enrolled in a Smart One "variable rate energy plan" at any time during the Class Period, which means any time up to December 31, 2016. Ag. ¶¶ II.A.33, II.A.12. Plaintiff does not explain what a "variable rate energy plan" is, or whether Smart One offers any other kind of plan. It is therefore unclear whether the proposed Class includes all of Smart One's energy customers through the end of last year or some subset of those customers.[4]

The term "energy" is also unclear, when used to define the proposed Class. Oladapo's factual allegations all relate to the natural gas prices he was promised (and the higher natural gas prices he was charged) by Smart One. *See* SAC ¶¶ 17-25 (recounting plaintiff's experiences); *id.* ¶¶ 26-30 (describing similar complaints made by other consumers who claimed they were overcharged for natural gas by Smart One). Plaintiff has never alleged any fraudulent, deceptive, or otherwise unlawful conduct by Smart One concerning any other form of energy, such as electricity. Indeed, the record now before the Court does not disclose whether Smart One has ever sold electricity, nor whether – if it has – it offers or offered "variable rate energy plans" to its electricity customers. Nonetheless, the Settlement Agreement defines the proposed Class as those who purchased "energy" from Smart One. Moreover, upon final approval of the Settlement Smart One would receive a class-wide release from claims arising out of "alleged advertising,

---

[4] The class alleged in the operative complaint would have included "all persons who purchased energy from Smart One," regardless of the nature of their plan. SAC ¶ 31.

marketing, or disclosure violations or any variable rates Smart One charged during the Class Period for the supply of *electricity or natural gas . . . .*" Ag. ¶ II.A.28 (emphasis added.)

Not only is the composition of the proposed Settlement Class unclear; plaintiff provides virtually no information about its size or distribution. His brief asserts only that the Class "is estimated to far exceed many hundreds of members." Mem. of Law at 17. Even this vague statement is ungrounded in any declaration or other evidentiary source. The dearth of information is likely not accidental. Plaintiff assures the Court that Smart One "has identifying information for all of its customers," including "their names, addresses, and the number of bills they received from Smart One." Mem. of Law at 19. If so, defendant knows – and has presumably told plaintiff's counsel – how many customers qualify for inclusion in the Class and where they reside. None of that information, however, has been shared with the Court.

## B.  The Settlement Consideration

Smart One has agreed to provide three forms of consideration to Class Members, described in the Settlement Agreement as Basic Cash Settlement Benefits, Arbitration Cash Benefits, and Class-Wide Equitable Relief.

The Basic Cash Settlement Benefit is a check for $20, available to any Class Member who obtains, fills out and submits an accurate and complete Claim Form on or before the deadline set by the Court. *See* Ag. ¶¶ II.A.4, II.A.5, II.A.7, II.A.36, II.H & Ex. A.[5] There is no preset limit on the amount of money that Smart One may be required to pay out in Basic Cash

---

[5] The Claim Form will apparently not be included in the form of notice that is mailed to all Class Members. As discussed in more detail *infra* at 11, the mailed notice will consist of a double-sided postcard. *See* Ag. ¶¶ II.A.11, II.A.35, II.E & Ex. B. The postcard, in turn, will direct Class Members to a website maintained by the Settlement Administrator (the Settlement Website), where a more detailed notice will be available, along with the forms that must be submitted before any settlement payment is actually made. *Id*. ¶¶ II.A.34, II.D, II.F.

Settlement Benefits. There is also no way for the Court to determine, or even estimate, the potential aggregate recovery to the Class in Basic Cash Settlement Benefits. The few hints that plaintiff has provided concerning the size of that Class suggest that this figure could be quite modest. If as many as 1,000 Class Members submit timely Claim Forms and receive $20 apiece (a fairly optimistic projection, given that plaintiff describes the Class as "many hundreds" rather than "many thousands" of members, *see* Mem. of Law at 17), the grand total that defendant will be required to pay in Basic Cash Settlement Benefits is $20,000. Moreover, Smart One will be entitled to deduct, from each Basic Cash Settlement Benefit, the amount of any "refund" previously sent to the customer and any "outstanding balance due" to Smart One. Ag. ¶ II.G. Plaintiff provides no information concerning how many Class Members were previously sent a refund or have an outstanding balance due. The Court therefore cannot assess the extent to which this provision would further diminish the settlement consideration going to the Class.

Class Members dissatisfied with the Basic Cash Settlement Benefit may seek Arbitration Cash Benefits by completing and submitting a Request for Arbitration and explaining, in writing, "the reason(s) you believe you are entitled to an Additional Claim Amount." Ag. ¶¶ II.A.3, II.H, Ex. D & Ex. E.[6] The form permits a claimant to submit additional pages, as well as documents that support the claim, but provides no information concerning the standards or guidelines that will be used to determine whether that claimant should receive more than $20 and, if so, how much more. That is because there are none. The Settlement Agreement provides only that awards

---

[6] The Request for Arbitration, like the Claim Form, will apparently not be included in the form of notice that is mailed to all Class Members. As discussed in more detail *infra* at 11, the mailed notice will consist of a double-sided postcard. *See* Ag. ¶¶ II.A.11, II.A.35, II.E & Ex. B. The postcard, in turn, will direct them to the Settlement Website. The Request for Arbitration will presumably be available on the Settlement Website, although even this is not entirely clear. *Compare* Ag. ¶ II.D *with id.* ¶ II.F.

will be determined by an Arbitrator, "after appropriate input from Class Counsel and Smart One." *Id*. ¶ II.H. The Arbitrator is identified as Judge Orlofsky, who previously served as the parties' settlement mediator. *Id*. ¶ II.A.2. His decision will be binding and non-appealable. *Id*. ¶¶ II.A.3, II.H. As in the case of Basic Cash Settlement Benefits, the Arbitration Cash Benefits may be reduced by the amount of any prior refunds sent to, or outstanding balances due from, the Class Members otherwise entitled to the award. Ag. ¶ II.G.

Arbitration Cash Benefits will be capped at $100,000 in the aggregate, and will be "paid exclusively out of any attorneys' fees, costs, and expenses awarded by this Court to Class Counsel." Ag. ¶ II.H. It is unclear whether the settling parties genuinely expect to see claims for Arbitration Cash Benefits in sums approaching the $100,000 cap. What is clear is that Class Counsel, who will in effect pay those benefits, will face a sharp conflict of interest every time a Class Member files a claim for Arbitration Cash Benefits. *See* Ag. II.H (Arbitrator will obtain "appropriate input" from Class Counsel prior to adjudicating Requests for Arbitration). Plaintiff's motion papers do not address this issue.

The Class-Wide Equitable Relief consists primarily of defendant's promise to "provide its sales agents with an instruction that they cannot state to prospective customers that Smart One's natural gas or electricity supply charges will always be lower than the incumbent utilities' natural gas or electricity supply charges unless such representation is substantiated at the time it is made." Ag. ¶ II.I. This formulation – which prohibits Smart One only from stating that its prices are *always* lower – appears to leave it free to represent that its prices are *usually*, *frequently*, or *mostly* lower, even though, according to plaintiff, those statements would also be false. *See* SAC ¶ 14 (Smart One knew that its gas prices would "always be higher" than market rates); *id*. ¶ 20 (after plaintiff switched to Smart One, it charged him higher gas rates than

Washington Gas for 11 months in a row). If there is any truth to these allegations, the Class-Wide Equitable Relief is fairly weak tea.

The Settlement Agreement also requires Smart One to modify its Welcome Letter. Ag. ¶ II.I & Ex. F. The Welcome Letter allegedly received by Oladapo guaranteed him "up to 10% savings on the [sic] Washington Gas variable supply charges for two months" and promised that Smart One's prices thereafter would "generally remain competitive in the industry." SAC Ex. 1. The new Welcome Letter, Ag. Ex. F, does not include either of these allegedly fraudulent representations. It simply thanks the customer for "giving SMART ONE ENERGY the opportunity to be your Natural Gas Supplier" and congratulates the customer on making a "wise choice." Ag. Ex. F. A more detailed attachment, which appears to relate only to Maryland customers switching from Washington Gas, states (as it did prior to the Settlement) that the monthly gas price "will be determined by Smart [sic] at its sole discretion, in response to changing market conditions." *Id*. It is not clear what form of Welcome Letter will be provided to defendant's electricity customers (if it has any) or to gas customers who reside in states other than Maryland or who switch from incumbents other than Washington Gas.

### C.     Fees

The Settlement Agreement provides for an award of up to $235,000 to Class Counsel for their attorneys' fees, costs, and expenses, payable by Smart One, subject to the approval of the Court. Ag. ¶ II.J.1. In addition, Smart One will pay the cost of providing notice to the Class, the fees of the Settlement Administrator, and any other costs of administering the Settlement. *Id*. ¶ II.J.2. The effectiveness of the Settlement does not depend on the fee award to Class Counsel. *See id*. ¶ III.C. Neither, however, does plaintiff or his counsel explain the basis or justification for an award of up to $235,000 in a case where the papers submitted thus far suggest that the

recovery to the Class itself could be a fraction of that figure. The attorneys' fee award, as noted above, will be reduced, dollar for dollar, by any Arbitration Cash Benefits awarded to Class Members by Judge Orlofsky.

## D. Release

Under the Settlement Agreement, upon final approval by the Court, plaintiff and all Class Members will be deemed to have released the following Released Claims against Smart One and its affiliates:

> [A]ny and all manner of actions, causes of action, suits, accounts, claims, demands, controversies, judgments, obligations, damages and liabilities of any nature whatsoever, whether or not now known, suspected or claimed, that were asserted, or could have been asserted by or on behalf of Plaintiff in this action, or that could have been asserted by or on behalf of any Settlement Class Member against any Released Person, that relate to or arise out of the conduct alleged in the Complaints or similar conduct (including but not limited to alleged advertising, marketing, or disclosure violations or any variable rates Smart One charged during the Class period for the supply of electricity or natural gas under any agreement, understanding, or program), and wherever the alleged conduct or similar conduct may have occurred.

Ag. ¶ II.A.28; *see also id.* ¶ II.A.29 (defining "Released Persons"); *id.* ¶ II.L (deeming release effective upon final approval of the Settlement and waving provisions of Cal. Corp. Code §1542 and any similar statute prohibiting release of unknown claims); *id.* ¶ III.B.1 (permitting potential Class Members to opt out, in which case they will not be bound by the class-wide release or entitled to any settlement benefits).

Under this language, Class Members who do not opt out would be deemed to have released not only claims arising out of conduct alleged in the Complaint, but also claims arising out of any "similar" conduct, including, apparently, claims arising out of Smart One's variable rate charges for electricity. As noted above, there are no allegations in the Complaint, and no discussion in plaintiff's motion papers, regarding fraudulent or unlawful electricity marketing or pricing by Smart One. The Court thus cannot determine what electricity-related claims, if any,

the Class Members may now possess, much less whether the consideration offered for releasing those claims is fair.

### E.     Notice

The attachments to the Settlement Agreement include a Summary Notice (Ex. B), an Expanded Notice (Ex. C), a Claim Form (Ex. A), and a Request for Arbitration (Ex. D). Only the Summary Notice will be mailed (in the form of a double-sided postcard) to Class Members. Ag. ¶¶ II.A.11, II.A.35, II.E. The postcard, in turn, will inform Class Members that they may obtain benefits by electing either the "cash option" or the "arbitrator option," and that in order to do so they must submit a Claim Form or a Request for Arbitration, respectively. The postcard does not mention the Class-wide Equitable Relief. It does, however, direct Class Members to the Settlement Website, where more information will be available, including the Expanded Notice, which includes information regarding the equitable relief, as well as instructions regarding how to opt out or object. *Id*. Exs. B, C. According to the Expanded Notice, copies of the Claim Form and the Request for Arbitration will also be available on the Settlement Website, and may be submitted either via the website or by mail. *Id*. Ex. C, at ECF page 4. According to ¶ II.A.11 of the Settlement Agreement, copies of the Expanded Notice may alternatively be obtained "by calling the toll-free number of the Settlement Administrator." However, the Summary Notice, in the form attached to the Settlement Agreement, does not provide a telephone number for the Claims Administrator. Ag. Ex. B. Class Members without computer access or literacy, therefore, will find it difficult to obtain the Expanded Notice at all, and equally difficult to obtain and submit either a Claim Form or a Request for Arbitration.

There are other inconsistencies, likely unintentional, among the various notice-related documents. For example, the Summary Notice states that Class Members may object to the

Settlement by sending written objections to the Settlement Administrator, with copies to counsel for the parties. Ag. Ex. B. The Expanded Notice, however, states that objections must be sent to the Clerk of the Court, with copies to counsel. *Id*. Ex. C, at ECF page 5. *See also* Ag. ¶ III.B.2 (stating that objectors must "file" their written objections and "serve" copies on counsel for both parties).

## III. DISCUSSION

Preliminary approval of a proposed class action settlement "is the first in a two-step process" required by Fed. R. Civ. P. 23(e) before a class action may be settled. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7625708, at *2 (S.D.N.Y. Dec. 21, 2016) (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig*., 176 F.R.D. 99, 102 (S.D.N.Y. 1997)). At this step, "prior to notice to the class, a court makes a preliminary evaluation of fairness." *Id.* "Preliminary approval is typically granted 'where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval.'" *Escort v. Princeton Info. Ltd.*, 2017 WL 1194684, at *2 (S.D.N.Y. Mar. 30, 2017) (quoting *Silver v. 31 Great Jones Rest.*, 2013 WL 208918, at *1 (S.D.N.Y. Jan. 4, 2013)); *accord In re Initial Pub. Offering Sec. Litig.,* 226 F.R.D. 186, 191 (S.D.N.Y. 2005). If preliminary approval is granted, "notice of a hearing is given to the class members, where class members and settling parties are provided the opportunity to be heard on the question of final court approval." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7625708, at *2. "Because of the two-step process, a grant of preliminary approval is 'at most a determination that there is what might be termed "probable cause" to submit the proposal to class members and hold a full-scale hearing as to its fairness.'" *Id.* (quoting *In re Traffic Exec. Ass'n-Eastern R.R.s*, 627 F.2d 631, 634 (2d Cir. 1980)).

While the "probable cause" standard makes it "unusual to deny an application for preliminary approval of a class action settlement agreement," *Brown v. Sega Amusements, U.S.A., Inc*. 2015 WL 1062409, at *1 n.2 (S.D.N.Y. Mar. 9, 2015), denial is appropriate where the settlement agreement contains "obvious deficiencies." *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y. 2007). *See also Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 314 (W.D.N.Y. 2016), *report and recommendation adopted*, *id*. at 302 ("[W]here the proposed settlement fails to adequately protect the interest of absent class members, preliminary approval should be denied."); *In re Nat'l Football League Players' Concussion Injury Litig.,* 961 F. Supp. 2d 708, 715 (E.D. Pa. 2014) (internal quotation marks and citation omitted) ("If a proposed settlement appears obviously deficient, the ruling should be issued before rather than after the parties incur the administrative expense to publish notice to the class and handle any objections.").

Preliminary approval should also be withheld where the parties "offer no viable way to gauge the reasonableness of the Settlement Agreement," *Brown*, 2015 WL 1062409, at *4, or fail to provide "enough information" to enable the Court to make an "intelligent appraisal" of one or more of the factors used to determine whether a class action settlement is fair. *Zink*, 155 F. Supp. 3d 297, at 311 (noting that unopposed motion papers gave the court insufficient information concerning the pre-settlement investigation conducted by plaintiff's counsel). In such cases, the denial may be without prejudice to "renewal upon a more detailed and substantial showing" that "the proposed settlement is both procedurally and substantively fair to absent class members." *Zink*, 155 F. Supp. 3d at 314. *Cf. Karvaly*, 245 F.R.D. at 94 (denying preliminary approval motion where the "fundamental problem" with the proposed settlement was that the parties sought to "certify, and to obtain a broad release against, an unjustifiably broad Rule 23(b)(3)

class, while providing notice and consideration appropriate only to a Rule 23(b)(2) class"); *Brown*, 2015 WL 1062409, at *6 (denying preliminary approval motion but permitting the parties to submit letters "setting forth revised settlement terms and notice procedures" if they are "able to overcome the Court's concerns").

If no class has previously been certified, the parties commonly ask the district court, as part of the preliminary settlement approval process, to preliminarily or "conditionally" certify a class for settlement purposes. *See generally* 4 Newberg on Class Actions § 13:17 (5th ed.) (noting that the current version of Fed. R. Civ. P. 23 omits any reference to "conditional" class certification but that many courts still use the term when making a preliminary determination of whether a proposed settlement-only class meets the requirement for certification).

Although the parties typically stipulate to the certification of the proposed class for settlement purposes, the Court bears an independent responsibility to "ensure that the requirements of Rule 23(a) and (b) have been met." *Denney v. Deutsche Bank AG,* 443 F.3d 253, 270 (2d Cir. 2006). As the Supreme Court explained in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997):

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial. But other specifications of the Rule – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

Thus, even at the preliminary approval stage, the Court must satisfy itself that "the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)." Manual for Complex Litigation (Fourth) § 21.632 (2004). *Accord In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 180-81 (S.D.N.Y. 2014). The plaintiff bears the burden of

establishing these criteria "by a preponderance of the evidence." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

## A. The Proposed Class

### 1. Numerosity

The proposed Settlement Class cannot be certified unless it is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity may be "presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Moreover, courts in our Circuit generally do not require "evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). "Nevertheless, a plaintiff seeking class certification 'must show some evidence of or reasonably estimate the number of class members.'" *Edge v. C. Tech Collections, Inc.*, 203 F.R.D. 85, 89 (E.D.N.Y. 2001) (quoting *Pecere v. Empire Blue Cross and Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y. 2000)). *Accord LeGrand v. New York City Trans. Auth.,* 1999 WL 342286, at *3 (S.D.N.Y. May 26, 1999)); *Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421, 1432 (S.D.N.Y. 1985).

"Where the plaintiff's assertion of numerosity is pure speculation or bare allegations, the motion for class certification fails." *Edge*, 203 F.R.D. at 89. *See also Demarco v. Edens*, 390 F.2d 836, 845 (2d Cir. 1968) (affirming denial of class certification where "[w]hat evidence there is in the record as to the size of the 'class' and the impracticability of joinder is pure speculation"); *Weissman v. ABC Fin. Servs., Inc.*, 203 F.R.D. 81, 84 (E.D.N.Y. 2001) (collecting cases); Thus, in *Wilner v. OSI Collection Servs., Inc.*, 198 F.R.D. 393, 397 (S.D.N.Y. 2001), the court initially refused to certify a class in a case brought under the Fair Debt Collection Practices Act, even though defendant was a "one of the largest debt collection agencies in the United States" and the allegedly unlawful letter it sent to the named plaintiff was a "standard form

letter," because plaintiff failed to present "one iota of *evidence* as to the number of people who may have received such a letter." (Emphasis added.)[7] *See also Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421, 1432 (S.D.N.Y. 1985) (denying certification of a class of investors where plaintiff's assertion of numerosity was based on "broad speculation" and "premised on the belief that because '[d]efendants [sic] documentation and the pattern of their conduct is clearly addressed to a large number of investors across the country . . . [t]he class is so numerous that joinder of all members is impracticable.'"); *Lloyd v. Indus. Bio-Test Labs., Inc.*, 454 F. Supp. 807, 812 (S.D.N.Y. 1978) (denying certification of a class of purchasers of exchange-traded options where motion was based "[c]ounsel's mere speculation as to the size of the putative class").

The plaintiff here has not presented "one iota of evidence," *Wilner*, 198 F.R.D. at 397, as to the number of customers who purchased variable rate energy plans from Smart One and who therefore would be included in the Class as defined in the Agreement. While common sense suggests that Oladapo is not the only person who did so, it is his burden to establish that the Class is sufficiently numerous to satisfy Rule 23(a)(1). *See Lloyd*, 454 F. Supp. at 812 (noting that Rule 23(a)(1) "requires a 'positive showing' by plaintiff," and holding that "the fact that the options might have been traded on a national exchange is in itself insufficient to prove the requisite numerosity"); *Mechigian*, 612 F. Supp. at 1432 (form documentation, coupled with counsel's assertion that plaintiff "reasonabl[y] believes" he was one of a large number of investors defrauded by the same documentation, "is hardly sufficient evidence to support a

---

[7] The *Wilner* plaintiff subsequently moved for reconsideration on the ground that defendant's "belatedly-filed [discovery] responses . . . demonstrated that some 14,210 letters in substantially the form of letter sent to [plaintiff] had been transmitted by [defendant.]" *Wilner v. OSI Collection Servs.*, Inc., 201 F.R.D. 321, 324-25 (2001). Noting that this number "more than satisfied the numerosity requirements," the Court granted plaintiff's motion. *Id.* at 325.

finding that the numerosity requirement has been met."). Thus far plaintiff has not met his burden, despite his claim that Smart One has the names and addresses of all of its customers and therefore that the proposed Class is "precise and readily identifiable." Mem. of Law at 19. For this reason alone the class certification prong of plaintiff's motion should be denied.

### 2.    Commonality and Typicality

A class representative must also show that "there are questions of law or fact common to the class" and that "the claims or defenses of the representative parties are typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(2) and (3). The commonality and typicality requirements "tend to merge into one another," as the "crux of both requirements is to ensure that 'maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (quoting *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n.13 (1982)). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (quoting *Falcon,* 457 U.S. at 157); *accord Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 84 (2d Cir. 2015), while typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376 (internal quotation marks and citation omitted).

Plaintiff glides lightly over these requirements in his brief. He asserts that "there are many common issues of fact and law," but mentions only two: whether defendant's representations "are misleading and deceptive," and "whether its natural energy rates are commensurate with, or substantially higher than, the rates charged by Defendant's competitors in the market." Mem. of Law at 17. Similarly, plaintiff asserts, his claims and those of the Class

"arise from the same alleged conduct," namely, the misleading representations that Smart One allegedly made concerning its "low introductory rate" and "savings on [customers'] energy bills." *Id*. at 18.

Assuming that Smart One's representations were reasonably uniform across all of its markets (and during all years that defendant has offered variable rate energy plans), the question whether those representations are misleading or deceptive could indeed qualify as a common issue for Rule 23(a)(2) purposes. But the Court has no basis on which to make such an assumption. To the contrary: according to plaintiff's brief, "Defendant used a variety of advertisements and methods to enroll its customers." Mem. of Law at 13. None of those advertisements have been presented to the Court, and none of those methods have been described. Thus, there is at present not even "one iota of evidence," *Wilner*, 198 F.R.D. at 397, demonstrating that other Class Members – particularly those in different markets, who switched from incumbent utilities other than Washington Gas, or who may have purchased electricity rather than gas from Smart One – heard, read, or relied upon representations or promises similar to those that plaintiff alleges in his pleading. Similarly, the question whether Smart One's rates are higher than its competitors' rates (which goes to both liability and damages) could perhaps be characterized as a common question if either Smart One or its competitiors charged the same rates across the Class. But plaintiff has presented no facts on either point. To the contrary: plaintiff concedes that determining Class-wide damages would be "an expensive and challenging task," noting, "Not only are there numerous states involved, but rates vary within each state based on the local utility, and rates vary over time." Mem. of Law at 13.

Although a putative class action plaintiff need not prove his case at the class certification stage, it is well-settled that "[a] party seeking class certification . . . must be prepared to prove

that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.," and he must do so at the class certification stage, even where "proof of commonality necessarily overlaps with" the merits. *Dukes*, 564 U.S. at 350-51 (emphasis in the original); *see also Lewis Tree Serv., Inc. v. Lucent Techs.s Inc.*, 211 F.R.D. 228, 232 (S.D.N.Y. 2002) (denying certification of a class consisting of purchasers of almost 60 different products manufactured by defendant, all of which allegedly contained "Y2K" defects, because plaintiff "has failed to present evidence that a common factual nexus exists among the purported class"). Here, plaintiff Oladapo has not presented any evidence to establish that the issues he identifies as common are in fact common to the Class, nor that his claims are typical of the claims possessed by the remainder of the Class. It is possible that, on a renewed motion, he can "affirmatively demonstrate" his compliance with both Rule 23(a)(2) and (a)(3), *Dukes*, 564 U.S. at 350. However, because the motion papers now before me do not contain any such demonstration, I cannot conclude, at present, that plaintiff has met the commonality or typicality requirements of Rule 23(a).

### 3. Adequacy

Before certifying a class, the Court must be satisfied that the would-be Class Representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry requires, among other things, that his counsel "be qualified, experienced and generally able to conduct the litigation," *In re Drexel Burnham Lambert Grp., Inc.,* 960 F.2d 285, 291 (2d Cir. 1992) (internal quotations and citation omitted), and that neither the proposed representative nor his attorneys have interests that conflict with those of the absent class members. *Id.*; *see also* Fed. R. Civ. P. 23(g)(4) (proposed class counsel must "fairly and adequately represent the interests of the class"); *Johnson v. Nextel Commc'ns, Inc.*, 293 F.R.D. 660, 672 (S.D.N.Y. 2013), *vacated on other grounds*, 780 F.3d 128 (2d Cir. 2015) ("Part and

parcel to the adequacy inquiry is the requirement that proposed counsel be able to 'fairly and adequately represent the interests of the class.'"); *Dukes,* 564 U.S. at 350 n.5 (quoting *Falcon,* 457 U.S. at 157-158 n.13) (the adequacy requirement "raises concerns about the competency of class counsel and conflicts of interest").

Here, a red flag is raised by ¶ II.H of the Agreement, which provides that Arbitration Cash Benefits will be "paid exclusively out of any attorneys' fees, costs, and expenses awarded by this Court to Class Counsel." The same provision gives Class Counsel the right to provide "input" to the Arbitrator on any request for Arbitration Cash Benefits by a Class Member. This mechanism pits the financial interests of Class Counsel squarely against the financial interests of the Class they propose to represent. The conflict is both direct and immediate: counsel's fee award will be reduced, dollar for dollar, every time a Class Member obtains more than $20 in settlement compensation. Moreover, the "input" provision gives Class Counsel the means to influence the decision of the Arbitrator.[8] Given this built-in conflict, I cannot conclude that the class representative and his counsel will fairly and adequately protect the interests of the class, even if I assume that both of the attorneys seeking appointment as Class Counsel are otherwise "qualified, experienced and generally able to conduct the litigation." *In re Drexel Burnham Lambert,* 960 F.2d at 291.

---

[8] Smart One will also have the right to provide "appropriate input" to the Arbitrator. Ag. ¶ II.H. However, it has no incentive to do so, since it will neither pay nor benefit from any award issued by the Arbitrator. As a practical matter, therefore, the only voice the Arbitrator is likely to hear, when considering a request for Arbitration Cash Benefits, will be the voice of the lawyers who will lose money if an award is made.

### 4. Predominance

Plaintiff contends that, in addition to satisfying all four prongs of Rule 23(a), the proposed Settlement Class satisfies Rule 23(b)(3), in that questions of law or fact common to class members "predominate over any questions affecting only individual members" and a class action is "superior to other methods for fairly and efficiently adjudicating the controversy." Plaintiff argues that defendant's liability turns on the same "common issue" discussed in connection with Rule 23(a)(2), namely, "whether its representations regarding rates were considered deceptive and misleading," such that "every class member's claim may be proven by the same (or similar) set of facts." Mem. of Law at 20. In addition, according to plaintiff, the extent of the injuries to the Class "will turn on largely common proof regarding the extent to which Smart One's rates are higher than the rates otherwise available in the market." *Id.*

As discussed above, in connection with Rule 23(a)(2), plaintiff has failed to establish that either of these issues is in fact "common" to the proposed Class. Therefore, I cannot rely on them to conclude that common issues predominate over questions requiring individualized proof. "Rule 23(b)(3)'s predominance requirement is 'more demanding than Rule 23(a).'" *Johnson*, 780 F.3d at 138 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)); *see also Amchem Prods.*, 521 U.S. at 623-24 ("Even if Rule 23(a)'s commonality requirement may be satisfied . . . the predominance criterion is far more demanding."); *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir. 2002) (predominance inquiry "is a more demanding criterion than the commonality inquiry under Rule 23(a)."). The predominance test is met if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore,* 306 F.3d at 1252. On the present record, I

cannot conclude that this test is likely to be met, and for this reason, as well as those discussed above, I cannot recommend that the Class be preliminary certified for settlement purposes.

**B.      The Settlement**

Even if I were prepared to recommend conditional class certification, I could not recommend approval of the Settlement itself, even preliminarily, as fair, reasonable, and adequate. Moreover, at least some of the "obvious deficiencies" in plaintiff's "probable cause" showing appear to be structural; that is, they are unlikely to be cured by a stronger evidentiary showing or a more detailed record.

**1.      Procedural Fairness**

Courts "encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Beckman v. Key Bank, N.A.*, 293 F.R.D. 467, 474 (S.D.N.Y. 2013). There is no requirement that the parties engage in formal discovery before negotiating a settlement. "In fact, informal discovery designed to develop a settlement's factual predicate is encouraged because it expedites the negotiation process and limits costs which could potentially reduce the value of the settlement." *Castagna v. Madison Square Garden, L.P.*, 2011 WL 2208614, at *6 (S.D.N.Y. June 7, 2011) (Swain, J.).

Whether the discovery is formal or informal, however, the parties must have "completed enough investigation to agree on a reasonable settlement." *Castagna*, 2011 WL 2208614, at *6. *See also Willix v. Healthfirst, Inc.,* 2011 WL 754862, at *4 (E.D.N.Y. Feb. 18, 2011) ("The pertinent question is whether counsel had an adequate appreciation of the merits of the case before negotiating.") (internal quotation marks omitted); *In re Sony SXRD Rear Projection Television Class Action Litig.*, 2008 WL 1956267, at *7 (S.D.N.Y. May 1, 2008) (formal discovery is not required "so long as the parties conducted sufficient discovery to understand

their claims and negotiate settlement terms"); *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("the question is whether the parties had adequate information about their claims").

In this case, I cannot determine whether plaintiff's counsel developed "an adequate appreciation of the merits of the case" before settling it. *Willix,* 2011 WL 754862, at *4. The Court is told only that informal discovery was conducted, and that it included, "among other things, seeking Smart One's marketing materials and obtaining information regarding the marketing practices of other companies in the same industry as Smart One." LaDuca Decl. ¶ 2. LaDuca does not indicate how long counsel spent conducting discovery, what volume of documents or data they reviewed, or whether they interviewed any Class Members, Smart One employees, or other witnesses. Nor does he reveal any of the information learned as a result of discovery, such as whether Smart One's marketing materials were uniform across the Class or varied substantially enough to jeopardize class certification or provide a defense to Class-wide liability. There is no evidence that counsel performed any investigation at all as to the size of the proposed Class, its geographical distribution, or whether it contains customers who purchased electricity from Smart One rather than natural gas. Nor is there any sign that counsel took steps, with or without expert assistance, to estimate the damages to which the proposed Class could be entitled. *See* Mem. of Law at 13 (noting that in order to determine damages plaintiff would be required to utilize an expert to "collect and collate data from Defendant" as well as "data regarding the historical rates charged by local utilities and other ESCOs to identify the market rate").[9]

---

[9] By way of comparison, in *Castagna,* which was a wage and hour case brought on behalf of security guards employed at Madison Square Garden:

To their credit, the parties sought the assistance of a neutral mediator, in the person of an experienced retired judge, when negotiating settlement terms. However, this fact alone does not give rise to a "presumption of procedural fairness" in the absence of "any 'meaningful discovery' into the merits of the claims." *W. v. City of New York*, 2016 WL 4367969, at *6 (S.D.N.Y. Aug. 12, 2016) (Swain, J.) (denying settlement approval, despite arms-length negotiations, where the "thin evidentiary record . . . undermin[es] the settlement's procedural fairness"). Even at the preliminary approval stage, it is not enough to show that the negotiations were "non-collusive";

---

> MSG produced, and Plaintiffs' counsel studied, volumes of computerized payroll entry records listing every occasion each of the 738 security officers worked for MSG from December 16, 2003 through June 6, 2010, and documents demonstrating the length of the MSG shows at which they worked during 2007, 2008, and 2009 and the total number of such occasions they worked. Plaintiffs' counsel reviewed and analyzed these data, created complex spreadsheets and formulae, and calculated the unpaid overtime owed to the class. Also, counsel obtained from Plaintiffs and other class members pay stubs, personal diaries, work logs, and time sheets, and other documents they maintained, showing the hours they worked, daily and weekly time and pay entries, W-2 forms, dates of hire and discharge, wage stubs, and other wage records. Plaintiffs' counsel analyzed these materials, data and payroll information as well, to cross-check MSG's records. No substantial discrepancies were found. Plaintiffs' counsel also interviewed the Plaintiffs and many class members about facts relevant to this action and proffered defenses.

2011 WL 2208614, at *1. Thereafter, the *Castagna* parties engaged in substantial settlement negotiations, first bilaterally and then with the assistance of a neutral mediator, which enabled them to settle the case for a sum representing 62.5% of the potential recovery under plaintiffs' "best possible case" analysis and 119% of the potential recovery under their "worst possible case" scenario. *Id*. at *1, *7-8. *See also Beckman*, 293 F.R.D. at 478 (approving settlement in wage and hour case after noting that defendant produced extensive documents and data concerning the relevant job classifications and that both sides "retained economic experts to analyze the data and perform damage calculations"); *In re Sony SXRD Rear Projection Television Class Action Litig.*, 2008 WL 1956267, at *2-3 (approving settlement involving malfunctioning TVs where plaintiffs "conducted extensive review of key engineering documents produced by Sony, interviews of several Sony project engineers, consultation with experts, and due diligence discovery," which "allowed the parties to establish the nature and cause of the [two key technical issues], the improvements Sony made to resolve those issues, the timing and efficacy of those improvements, and Sony's ability to replace defective [parts].")

the plaintiff must also demonstrate that they were "informed." *Escort*, 2017 WL 1194684, at *2; *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. at 191. Plaintiff Oladapo has not satisfied that standard. *See Zink*, 155 F. Supp. 3d at 311 (denying preliminary settlement approval where, among other things, the parties claimed to have engaged in "extensive discovery" but did not provide enough information to enable the court to make an "intelligent appraisal" of its sufficiency).

### 2. Substantive Fairness

"The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable, and adequate." *Brown*, 2015 WL 1062409, at *4 (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982), and denying preliminary approval of a facially inadequate class action settlement). Here, as in *Brown*, plaintiff's motion papers offer "no viable way" to assess the reasonableness of the settlement consideration provided, 2015 WL 1062409, at *4. What little information can be gleaned from those papers suggests, if anything, that the cash consideration would be unreasonably low, the equitable relief would not be meaningful, and the Class Members would be required to release claims potentially broader than those for which they would receive any compensation. Moreover, as noted above, there is a built-in conflict between the financial interests of the Class Members and those of Class Counsel, whose proposed fee application appears likely to outstrip the actual payments to their clients by a wide margin. I address each issue in turn.

### i. Settlement Consideration

The Basic Cash Benefit of $20 per Class Member (like the "Individual Payment Amount" of $50 in *Brown*) is untethered to any analysis of the actual damages incurred by the named plaintiff, by any other Class Member, or by the Class in the aggregate. Although the operative complaint details the per-Therm prices charged to Oladapo by Smart One and compares them to

the lower per-Therm prices charged by his prior gas supplier, *see* SAC ¶ 20, plaintiff has never stated how many Therms he used while a Smart One customer. There is thus nothing in the record from which the Court could determine the amount by which the named plaintiff himself was overcharged for natural gas during the Class Period.[10] Moreover, as discussed above, plaintiff has made no showing as to whether other Class Members – particularly those in other markets, or who switched from other incumbent utilities, or who purchased electricity rather than natural gas – were overcharged in similar proportions or amounts. Given the factual vacuum, "[t]he individual payment amounts described in the Settlement Agreement appear to be arbitrary, i.e., unrelated to any injury suffered by individual class members." *Brown*, 2015 WL 1062409, at *4.[11]

Similarly, since the Court has not been told the size of the Class – nor given any information concerning the likely claims rate – it is difficult to estimate the aggregate Basic Cash Benefits that would be paid by Smart One to the Class, and impossible to compare that figure to the relief that could likely be obtained after trial. *Cf. Castagna*, 2011 WL 2208614, at *8-9 (approving settlement after comparing settlement consideration to "best possible case" and "worst possible case" litigation scenarios). What little information can be gleaned from the file suggests that Smart One is unlikely to pay more than a tiny fraction of the "millions of dollars"

---

[10] If Oladapo consumed 745 Therms annually, which was the average annual natural gas consumption for a Maryland residential customer in 2013, *see supra* n.3, then he was overcharged by approximately $130 during the 11–month period (July 2013-May 2014) for which he has charted the comparative per-Therm prices charged by Smart One and Maryland Gas. *See* SAC ¶ 20. The Basic Cash Benefit represents 15.4% of that amount.

[11] It is not even clear whether all or most Class Members will receive the full $20 after submitting their Claim Forms. As noted above, Smart One has reserved the right to deduct the amount of any "refund" previously sent or any "outstanding balance due," Ag. ¶ II.G, but the Court has not been told how many Class Members will be affected by this provision, or in what amount.

in aggregate damages that plaintiff alleged before entering into settlement negotiations. SAC ¶ 36; *see also id.* ¶ 3 ("the aggregate amount in controversy exceed $5,000,000 exclusive of interest and costs.").

Plaintiff now suggests that the Class consists of "many hundreds" rather than many thousands of members. *See* Mem. of Law at 17. That figure in turn suggests that the number of Class Members likely to submit Claim Forms will be, at best, many tens.[12] Even if I assume that 1,000 Class Members submit Claim Forms (100% of a 1,000-member Class or 10% of a 10,000-member Class), and that each of them receives the full $20 available as a Basic Cash Benefit, that would mean that Smart One would pay out a total of $20,000 in Basic Cash Benefits, which is 0.4% of the $5 million that plaintiff previously alleged as the aggregate amount in controversy (SAC ¶ 3), and 8.5% of the amount of the attorneys' fees that plaintiff's counsel propose to seek for achieving the proposed Settlement. Ag. ¶ II.J.1.

---

[12] In a "claims made" settlement such as this, where class members are required to obtain, fill out, and submit a form before receiving any compensation, response rates of 10% or less are common. *See, e.g.*, *Sylvester v. CIGNA Corp.,* 369 F. Supp. 2d 34, 51 (D. Me. 2005) ("'[C]laims made' settlements regularly yield response rates of 10 percent or less."); *see also Chambery v. Tuxedo Junction Inc.*, 2014 WL 3725157, at *7 (W.D.N.Y. July 25, 2014) (37% claims rate was "unusually high"). "Given the small value of most class action claims, it should not be surprising that few class members bother to spend the time filing a claim." 4 Newberg on Class Actions § 12:17. Where the per-person cash award is "modest," and the defendant has the ability to lower it further (here, by deducting prior refunds or outstanding balances), the claims rate is likely to be "further depressed." *Jermyn v. Best Buy Stores, L.P.*, 2012 WL 2505644, at *6 (S.D.N.Y. June 27, 2012). For these reasons, the "best practice," in a class action settlement, is "to create a system for distributing the class's funds without the necessity of any claiming process, much less a cumbersome one." 4 Newberg on Class Actions § 12:17. It appears that the parties here could easily have done so, since Smart One has the names and addresses of all of its customers, making the proposed Class "precise and readily identifiable." Mem. of Law at 19. For reasons not addressed in the motion papers, however, they agreed instead to a system requiring each Class Member to go to a website, download or otherwise request a Claim Form, fill it out, and then upload or mail it back to the Claims Administrator in order to receive, at most, $20. *See* Ag. ¶¶ II.A.5, II.A. 6, II.A.7, II.A.8, II.A.36, II.D, II.F, & II.G.

In assessing whether a class action settlement falls "within the range of possible approval," *Escort*, 2017 WL 1194684, at *2, the most significant factor is "the strength of the plaintiff's case balanced against the settlement offer." *Zink*, 155 F. Supp. 3d at 312 (quoting *In re Traffic Exec. Ass'n-Eastern R.R.s*, 627 F.2d at 633). The district court is "required to explore the facts sufficiently to make an intelligent comparison between the amount of the compromise and the probable recovery." *In re Traffic Exec. Ass'n-Eastern R.R.s*, 627 F.2d at 633; *see also Global Crossing Sec.,* 225 F.R.D. at 455 (the court's "primary concern [is] with the substantive terms of the settlement . . . and how they compare to the likely result of a trial"). Here, the $20-per-head basic settlement offer appears to be remarkably low, whether viewed as 15.4% of an individual Class Member's estimated loss, *see supra* n.10, or as 0.4% of the estimated aggregate amount in controversy. Moreover, plaintiff does not explain, other than in generalities, what barriers to recovery would make such a low return "fair, reasonable, and adequate." *See* Mem. of Law at 15 (arguing that damages owed to the Settlement Class "could be substantial" but that, "on the other hand," Smart One could "defeat liability entirely, resulting in no recovery for class members.").

I recognize that, in addition to the Basic Cash Settlement Benefit, Class members may seek Arbitration Cash Benefits in amounts greater than $20, up to a maximum aggregate sum of $100,000. However, given (i) the additional work required to submit a Request for Arbitration, *see* Ag. ¶¶ II.A.3, II.H & Ex. E; (ii) the lack of any standards or guidelines for determining what additional amount, if any, a claimant should receive, *see id.* ¶ II.H; (iii) the fact that Class Counsel, who will as a practical matter pay any Arbitration Cash Benefits awarded, will be permitted to provide "appropriate input" to the Arbitrator as to each decision, *id.*; and (iv) the risk that any Arbitration Cash Benefits that might otherwise be awarded will be reduced by the claimant's prior outstanding balance, *see id.* ¶ II.G, it seems unlikely that any significant number

of Class Members will submit arbitration claims, and even less likely that the Class as a whole will recover anything close to $100,000 through this mechanism.

I also recognize that there is a non-cash component to the Settlement, consisting of prospective changes to Smart One's marketing materials and Welcome Letter. Ag. ¶ II.I. These changes may prevent future consumers, if any, from being misled in the same manner (or to the same degree) as the Class Members, but will provide no benefit to the current and past Smart One customers who are the members of the Settlement Class.[13] Moreover, as noted above, the changes to the marketing materials would lessen, but not eliminate, the extent to which they are allegedly misleading, and the proposed Welcome Letter would make no sense to any Class Member who switched from an incumbent utility other than Washington Gas. It is not clear whether this reflects "drafting difficulties" or the parties' "failure to confront" the "core factual allegations," *Brown*, 2015 WL 1062409, at *5 – in this case, their allegations that there exists a "nationwide" Class including customers in different markets who switched from different incumbents. *See* SAC ¶ 3; Mem. of Law at 13. Either way, on the present record, I cannot conclude that the Equitable Relief adds significant value for the proposed Settlement Class.

It is true, as plaintiff points out, *see* Mem. of Law at 14-15, that judging the fairness of a settlement "is not susceptible of a mathematical equation yielding a particularized sum." *Michael Milkin and Assocs. Securities Litig.*, 150 F.R.D. 56, 66 (S.D.N.Y. 1992). In this case, however, plaintiff has not even provided the Court with the tools needed to perform basic settlement

---

[13] It is not clear from plaintiff's motion papers whether Smart One is still in the business of providing energy. Its website, already disabled at the time plaintiff filed the operative Complaint, is still inaccessible, and the company has very little presence online. *See* SAC ¶ 29 n.6. Plaintiff informs the Court, without any supporting facts or other explanation, that he "has no concerns that Smart One has the ability to pay all claims made in the contest of this Settlement Agreement" but that its "ability to withstand a substantially greater settlement" is "by no means assured." Mem. of Law at 14.

arithmetic. I cannot assess how much the Class Members lost, "[h]ow much [they would] receive

if the litigation were successful," or "[w]hat specifically were the risks of this litigation." *Brown*,

2015 WL 1062409, at \*4. "[I]f there are valid reasons for recommending the proposed

settlement, they have not be adequately discussed" in plaintiff's motion papers. *Zink*, 155 F.

Supp. 3d at 313. For this reason as well, I cannot recommend that the motion be granted.

### i.  *Release*

A settlement cannot be fair, reasonable and adequate if the Class-wide release is

overbroad. *See Karvaly*, 245 F.R.D. at 88 ("The Court's most serious concern with the terms of

the proposed settlement is the unduly broad general release that the parties seek to impose upon

all Class Members as a condition of this settlement."); *TBK Partners, Ltd. v. W. Union Corp.*,

675 F.2d 456, 461 (2d Cir. 1982) (quoting *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*,

660 F.2d 9, 19 (2d Cir. 1981)) ("[S]pecial care must be taken to ensure that the release of a claim

not asserted within a class action or not shared alike by all class members does not represent an

'advantage to the class . . . by the uncompensated sacrifice of claims of members, whether few or

many.'"). "The release of claims for no relief is the most obvious red flag, but there are other

troubling situations. For example, claims may go implicitly uncompensated if class members

with different claims receive the same relief." 4 Newberg on Class Actions § 13:60.

Both of these red flags are present here. Every Class Member is allocated $20 in Basic

Cash Settlement Benefits, even though some (like plaintiff Oladapo) purchased only natural gas

from Smart One, some may have purchased electricity (in response to unknown marketing

materials, at unknown rates), and some may have purchased both. Even if $20 is reasonable

compensation for a gas-only purchaser, the flat per-head basic award structure begs the question

whether Class Members who also purchased electricity (if there are any such Class Members) are

being compensated for one claim while effectively releasing two.

Moreover, the proposed release would extend to all claims that arise out of or relate to "the conduct alleged in the Complaints [sic] or similar conduct," which is defined to include all claims arising out of "alleged advertising, marketing, or disclosure violations *or* any variable rates Smart One charged during the Class period for the supply of electricity or natural gas under any agreement, understanding, or program." Ag. ¶ II.A.28 (emphasis added). It is "well established" in this Circuit "that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) (citing *TBK Partners,* 675 F.2d at 460). To the extent that Smart One proposes to bar all future marketing-related claims by Class Members – whether or not arising from to variable-rate programs – the Agreement runs afoul of the "identical factual predicate" rule and would improperly require Class Members to release claims for which they are not being compensated, arising from facts not alleged in the operative Complaint.

### ii.   Fees

"[T]he duty to investigate the provisions of the suggested settlement includes the obligation to explore the manner in which fees of class counsel are to be paid and the dollar amount for such services." *Zink*, 155 F. Supp. 3d at 310 (quoting *Strong v. BellSouth Telecomms., Inc.,* 137 F.3d 844, 849 (5th Cir. 1998)). Even though the ultimate fee award will be determined by the Court, after a final fairness hearing, a court may consider, at the preliminary approval stage, whether the proposed fee award appears reasonable. In *Brown*, one of the factors that prompted the court to deny preliminary settlement approval was the proposed fee award of $850,000, which "exceed[ed] the entire settlement fund of $650,000 by $200,000." 2015 WL 1062409, at *5. "No such legal fee has ever before been approved by this Court." *Id*. *See also*

*Zink*, 155 F. Supp. 3d at 310 (court was "concerned" by proposed fee award of one-third of settlement fund, where unclaimed portion of fund would revert to defendant).

Here, the proposed fee award of $245,000 is completely untethered to the award to the Class itself. Indeed, as discussed above, plaintiff carefully avoids any discussion of how much Smart One will actually pay the Class in settlement, and therefore cannot calculate, or even estimate, what proportion of the settlement dollars will flow to Class Counsel as opposed to Class Members. What little information is available in the record suggests that a fee award in the amount set forth in the Agreement would significantly exceed the aggregate award to the Class. This possibility, together with the parties' agreement that Arbitration Cash Benefits will be paid out of Class Counsel's fee award, "cause[s] me to question the extent to which [Class Counsel's] interests are aligned with the interests of the [C]lass." *Zink*, 155 F. Supp. 3d at 311.

## CONCLUSION

There is a "strong judicial policy in favor of settlements, particularly in the class action context." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009) (internal quotation marks omitted). However, preliminary approval of a proposed class action settlement "is not simply a judicial 'rubber stamp' of the parties' agreement." *Zink*, 155 F. Supp. 3d at 308 (quoting *Martin v. Cargill, Inc*., 295 F.R.D. 380, 383-84 (D. Minn. 2013)). In this case, after carefully considering all of the materials placed before the Court, I cannot conclude that the proposed Class should be certified or that the proposed Settlement is the product of adequately informed negotiations and falls within the range of possible approval. I therefore recommend, respectfully, that the motion be DENIED without prejudice to renewal after the deficiencies identified above have been addressed.

Dated: New York, New York
      November 9 , 2017

**SO ORDERED**.

**BARBARA MOSES**

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from this date to file written objections to the portion of this Opinion constituting a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Hon. Laura Taylor Swain at 500 Pearl Street, New York, New York 10007, and to the chambers of the Hon. Barbara Moses at the same address. Any request for an extension of time to file objections must be directed to Judge Swain. Failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).